UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN M. TRELA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 6195 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION & ORDER**

Kathleen M. Trela brought this suit against her former employer, United Parcel Service, Inc. ("UPS") alleging that her supervisor at UPS sexually harassed her and that another UPS superior terminated her in retaliation for her complaint of harassment, all in violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.* (2006). UPS moves for summary judgment. For the reasons stated herein, UPS's motion is granted.

### I. FACTUAL BACKGROUND

UPS initially moves to strike plaintiff's counter-statement of material facts as insufficiently concise and supported by improperly broad citations to the record. Local Rule 56(b)(3) requires that a party opposing summary judgment file, *inter alia*, a statement "of short numbered paragraphs, of any additional facts . . . including references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56(b)(3). This court's standing order further states that citations "must be specific. For example, a reference to a transcript that does not include the page and line numbers is not a 'specific' reference. The court **will not** search a multi-page document nor guess as to

which language in a document the party relies upon." (Standing Order 3 (emphasis in original).)

UPS's assessment of the deficiencies of Trela's counter-statement of facts is accurate. The individual statements range up to 11 sentences apiece, often with only one citation to a broad range of deposition transcript to support the entire statement. Each of the offending citations includes references to several page numbers, and no citation includes references to line numbers. Lumping discrete facts together under one generalized citation may suffice in a memorandum of law, but it is unsatisfactory for a statement of facts. The requirement of specific citations helps the parties and the court focus on asserted disputed issues of fact, a required task in considering motions for summary judgment, but a task made impossible when facts are blurred together as they are here. It is within the court's discretion to strike statements of fact that are insufficiently supported by citations to the record. *See Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004) (affirming striking of facts with citations to whole exhibits, noting that it is not the district court's duty to "scour the record to make the case of a party"); *see also Ross v. St. Eve*, No. 05 C 2797, 2009 WL 2382529, at *2 (N.D. Ill. July 31, 2009). In *Ross*, this court, recognizing its duty to treat *pro se* plaintiffs leniently, nevertheless struck certain responses to a statement of facts; here, Trela is represented by counsel and so is entitled to no such leniency. Trela's counter-statements 1, 4, 7, and 8–the most egregious offenders–are stricken.

UPS employed Trela from June 9, 2008 to August 18, 2008 as a part-time package loader in an outbound dock in its facility in Hodgkins, Illinois. (Plaintiff's

Answer to Defendant's Rule 56.1 Statement of Facts ("Pl.'s Resp.") ¶ 3.)[1] Trela, who was responsible for loading packages into a trailer, was supervised by Tim Vickers, whose manager was Shifuana Greer. (*Id.* ¶¶ 4-5.)

UPS gives each new employee a Cornerstone Training Book, which documents, *inter alia*, the employee's performance and contacts with supervisors. (*Id.* ¶¶ 6-7.) Loaders like Trela are measured in part by a metric known as pieces-per-hour ("pph"). (*Id.* ¶ 9.) After each shift, Trela spoke with Vickers about her pph performance; Vickers told Trela her pph figure was good, then recorded it in her Book. (*Id.* ¶¶ 10-11.) He never told Trela her performance was unacceptable, criticized her pph, wrote her up, or disciplined her. (*Id.* ¶¶ 12-13.)

The Book was not limited to employee performance, but included personal information about the employee in question, apparently in an attempt by UPS to get to know its employees. Under the guise of the Book, Vickers asked Trela personal questions which made Trela uncomfortable, and once he asked Trela to go to out drinking. (Pl.'s Resp. ¶¶ 14, 15; *see also* United Parcel Service, Inc.'s Response to Plaintiff's Counter-Statement of Material Facts ("Def.'s Resp.") ¶ 2.) After the first day, though, Vickers never asked Trela to socialize with him. (Pl.'s Resp. ¶ 18.) On other occasions, Vickers told other UPS employees that they were "not pretty like she is." (*Id.* ¶ 17; *see also* Def.'s Resp. ¶ 3.) Trela found Vickers's actions unwelcoming, but she never reported harassment, and she never made any written complaint of harassment or discrimination. (Pl.'s Resp. ¶¶ 23, 24, 33.) Trela once complained verbally to supervisor Jason Sloma that she did not like Vickers asking her personal questions or asking her to

---

[1] Citations to "Pl.'s Resp. _____" or "Def.'s Resp. _____" refer not only to the response, but also to the statement responded to and the documents cited in the statement and the response.

3

go out drinking, *id.* ¶ 29; Sloma did not pass this complaint along to Vickers. (*Id.* ¶ 31.)[2] No one else at UPS said or did anything that Trela considered to be sexual harassment. (*Id.* ¶ 19.) There is no evidence that Vickers was aware of any complaint of sexual harassment by Trela. (*Id.* ¶ 32.)[3]

Trela testified that Vickers lost her Book on two separate occasions, and then made up Trela's pph figures for the missing days, in her opinion occasionally giving her more credit than she was due for those days. (*Id.* ¶¶ 20-21.) In any case, Trela was never disciplined in any way for her pph performance. (Pl.'s Resp. ¶ 22.) Even so, Trela complained to a training supervisor named Bryan Gray about issues regarding her Book. (*Id.* ¶¶ 25, 28.) On another occasion, Trela complained to Gray that Vickers "picked" on her and did not like her "because she was a girl." (*Id.* ¶ 27.) Later, according to Trela, Vickers told her, "[I]f you don't understand anything, come to me and I will explain it. Don't tell people I'm making up numbers for you." (*Id.* ¶ 26.)

On August 7, 2008, Trela and other new hires, having completed their training period, met with a training manager to discuss employment-related issues; while in the meeting, Trela said nothing about harassment or unfair treatment. (*Id.* ¶ 35.) However, at the end of the meeting, interviewer Lenis Davidson saw Trela crying and asked her if she would like to speak privately. (*Id.* ¶ 36.) The two met privately, and Trela complained that Vickers picked on her, lost her Book, made up pph numbers, screamed at her, and made her cry. (Pl.'s Resp. ¶ 36.) Davidson promised she would monitor

---

[2] The parties agree that Sloma was known to Trela only as "McLovin." (*See id.* ¶ 29.) Neither party pointed to evidence suggesting that Sloma passed along Trela's report to anyone else, or that Sloma was involved in any personnel decision regarding Trela.

[3] Trela asserts that such evidence exists, but references a paragraph that establishes that others knew about her problems with Vickers, not that Vickers knew about her complaint.

Vickers and get back to Trela. (*Id.*) Davidson did not speak to Vickers about the meeting with Trela, of which Vickers was unaware. (*Id.* ¶ 37.)

One day after Trela's meeting with Davidson, Trela was loading packages, receiving assistance from a driver, when Vickers, supervising, said that Trela was experienced enough that she could work on her own. (*Id.* ¶ 38.) Trela became upset by Vickers's comments and walked off the job to go find Davidson. (*Id.*) On the way, Trela crossed paths with manager Greer and with Marcus Rodriguez, who also works in a supervisory role. (*Id.* ¶¶ 39, 41.)[4] Rodriguez stopped Trela and asked her if he and Greer could help her. (Pl.'s Resp. ¶ 39.) Trela declined Rodriguez's offer of help, saying that she did not want others to know her business, but agreed to go home and collect herself, and to meet with Rodriguez and Greer the following Monday, August 11. (*Id.* ¶¶ 40, 41.)[5] However, Trela did not report to work on August 11 because, according to Trela, her daughter was sick. (*Id.* ¶ 41; Def.'s Resp. ¶ 6.) She averred that she tried to contact UPS but did not know the correct number. (Def.'s Resp. ¶ 6.)

Trela returned to work August 12, at which point Rodriguez and Greer met with her. (Pl.'s Resp. ¶¶ 44-47.) When it became clear that Vickers was the subject of the meeting, Greer asked Trela if Vickers could join the meeting, and Trela agreed. (*Id.* ¶¶

---

[4] As UPS points out, Trela's response to UPS's statement of facts is deficient; Trela did not respond to UPS's statement number 40, and accordingly mis-numbered her responses thereafter. The court deems UPS's statement number 40 admitted and will construe Trela's responses thereafter to respond to the paragraphs as written and numbered by UPS, not as numbered by Trela (*i.e.*, response number 40 applies to statement number 41, etc.). Citations to Trela's response in this opinion likewise proceed according to UPS's numbering, not Trela's.

[5] Trela claims that Rodriguez made certain statements suggesting that he knew of her problem with Vickers, a contention that UPS disputes. (*See* Def.'s Resp. ¶ 6.) Trela's claimed support for these statements is a portion of her deposition transcript; however, she did not include that portion of her deposition transcript among the materials she attached to her counter-statement of facts, nor is that portion among the excerpts submitted by UPS. Without any support in the record, this claim does not create an issue of fact that Rodriguez actually made the statements as claimed by Trela.

48-49.) A union representative had previously told Trela that he would not attend the meeting unless asked by management, and Trela did not ask Greer if she could have a representative present. (*Id.* ¶¶ 43, 50.) Once Vickers arrived, Greer asked Trela what her concern was, and Trela stated that Vickers had lost her Book and made up her pph, a charge that Vickers denied. (Pl.'s Resp. ¶ 51.) In response to Vickers's denial, Trela got up, stated "You won, Tim," and walked out of the meeting. (*Id.* ¶ 52.) Trela did not mention sexual harassment in the meeting, which lasted less than two minutes. (*Id.* ¶¶ 52, 56.) Greer and Vickers understood that Trela was quitting and walking off the job, at least in part because Greer heard Trela say, "I quit," a statement which Greer relayed to Trela's union representative. (*Id.* ¶¶ 53-54; *see also* Def.'s Resp. ¶ 16.)

Despite not being told she was fired, Pl.'s Resp. ¶ 58, Trela walked from the meeting out of the building. (*Id.* ¶ 55.) Trela testified that, as she was leaving, she heard Rodriguez, who was conversing with the union representative, tell her to "keep walking," and testified that Rodriguez "wouldn't let me stop." (Def.'s Resp. ¶ 9.) Believing that Trela had just quit, Greer instructed another supervisor to collect Trela's identification badge, which Trela surrendered before leaving the building. (Pl.'s Resp. ¶ 60.)

After leaving the building, Trela found Davidson, to whom she had previously lodged her complaint regarding Vickers. (*Id.* ¶ 61.) Trela told Davidson that her identification badge had been taken. (*Id.* ¶ 62.) Davidson took Trela to see Davidson's boss, Tony Navarro, who called a manager, John Perteet; all three heard Trela's story. (*Id.* ¶ 63.) Trela explained that she wanted to work, but not in her previous position. (*Id.* ¶ 65; *see also* Def.'s Resp. ¶ 11.) Upon request, Trela provided her cellular telephone

number to Perteet, who, pursuant to UPS's general policy of trying to retain new employees, agreed to call her to try to get her to return to work. (*Id.* ¶¶ 66-68.)

Perteet called Trela at least once in an effort to get Trela to return to work. (Pl.'s Resp. ¶¶ 69, 75.) Trela missed that call, and then called the number back as shown on her cellular telephone, receiving instead UPS's automated telephone line. (*Id.* ¶¶ 69, 71.) Trela was unable to navigate that automated line, and so hung up. (Def.'s Resp. ¶ 12.) She made no other efforts to contact UPS. (Pl.'s Resp. ¶¶ 69, 71.) Perteet testified that he called Trela two more times, but Trela states that she received only the one call described above; telephone records produced by Perteet confirm that he called Trela on three separate instances. (Pl.'s Resp. ¶ 69; *see also* Def.'s Ex. 8, at 5-6.) Perteet also testified that he left Trela a voicemail, which Trela denied receiving. (Pl.'s Resp. ¶ 70.)

After August 12, 2008, Trela did not contact anyone at UPS, did not return to the UPS facility, and did not otherwise seek to return to work. (*Id.* ¶¶ 71-73.) On August 18, 2008, UPS removed Trela from its payroll, finding that she had abandoned her position. (*Id.* ¶ 75.)

## II. LEGAL STANDARD

Summary judgment is warranted where "the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). Normal burdens of proof remain, however. If a plaintiff has failed to establish one of the

elements of his case and there is no factual dispute regarding that element, then summary judgment will be granted in favor of the defendant. *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006); *see also Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 892 (7th Cir. 2005) ("Summary judgment for a defendant is appropriate when a plaintiff fails to make a sufficient showing to establish the existence of an element essential to [his] case on which she will bear the burden of proof at trial.") (quoting *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (citations and alterations omitted)). In the context of employment discrimination cases, the court must analyze an employer's assertions "with 'added rigor' before granting summary judgment." *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455 (7th Cir. 1999) (quoting *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993)).

### III. ANALYSIS

The parties agree that Trela has abandoned her sexual harassment claim. (*See* Pl.'s Resp. ¶ 78.) UPS's motion is therefore granted as to that claim. However, Trela does not concede her retaliation claim. Title VII prohibits an employer from discriminating against an employee "because [s]he has opposed any practice made an unlawful practice by" Title VII. 42 U.S.C. § 2000e-3a. Claims for discrimination based on opposition to unlawful practices, or retaliation, are governed as follows:

> A *prima facie* case of retaliation may be made directly or indirectly. Under the direct method, a plaintiff must show (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action taken by the employer; and (3) a causal connection between the two. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005).

*Kodl v. Bd. of Educ.*, 490 F.3d 558, 562 (7th Cir. 2007). Neither party argues that Trela can establish a claim for retaliation by the indirect method, and rightfully so: the record is

8

devoid of evidence of similarly situated employees. *Id.* Therefore, the court considers Trela's retaliation claim only under the direct method of proof.

A. **Statutorily Protected Activity**

Trela asserts that she engaged in protected activity when she reported her problems with Vickers to Davidson on August 7, 2008.[6] In her Equal Employment Opportunity Commission ("EEOC") charge, Trela averred that she complained to Davidson of Vickers's "sexual harassment." Even assuming this averment constitutes evidence,[7] it is conclusory and completely lacking in factual detail.

Trela's remaining evidence that her meeting with Davidson constituted protected activity comes from her deposition. There, she made no mention of Vickers's "sexual harassment" to Davidson, instead claiming that she was being treated unfairly, that Vickers was picking on her, that Vickers yelled at her, that he lost her Book, and that he fudged the pph numbers in her Book. In her deposition testimony recapping her report to Davidson, Trela mentioned neither sexual harassment explicitly nor any facts suggesting sexual harassment.

Complaints of unfair treatment with no express or implied connection to sexual harassment or gender discrimination fall short of the threshold of statutorily protected

---

[6] In a "Preliminary Statement" to her brief, Trela references her previous complaints individually to Gray, Sloma, and the union representative. However, she makes no argument that these discussions constituted statutorily protected activity, or that these discussions were in any way connected with any adverse employment action allegedly taken against her. The court therefore will not consider them as such.
    Likewise, Trela has not argued that her meeting with Greer on August 12, 2008 constituted protected activity, nor could she, given that she admitted that she never stated in that meeting that Vickers sexually harassed or discriminated against her. (*See* Pl.'s Resp. ¶ 55.)

[7] Trela's EEOC charge, below her signature, states, "I declare under penalty that the foregoing is true and correct[.] I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief." While this resembles an affidavit that would normally suffice as competent evidence at this stage, the Seventh Circuit has stated that an EEOC charge is "not evidence competent to combat summary judgment." *See Maldonado v. U.S. Bank*, 186 F.3d 759, 764 (7th Cir. 1999); *see also Nichols ex rel. Nichols v. Revere Elec. Supply Co.*, No. 97 C 50364, 1999 WL 626770, at *4 (N.D. Ill. July 13, 1999).

activity. For example, the Seventh Circuit held that a plaintiff who complained that her supervisor mistreated her, leaving her in tears, and that she was treated unequally, did not engage in statutorily protected activity because she did not complain that any of her supervisor's mistreatment of her was gender-related:

> Sitar complained only that she felt picked on, not that she was discriminated against "because of" sex or gender, which is what Title VII requires. *Hamm v. Weyauwega Milk Prods., Inc.*, 332 F.3d 1058, 1066 (7th Cir. 2003). Although an employee need not use the magic words "sex" or "gender discrimination" to bring her speech within Title VII's retaliation protections, "she has to at least say something to indicate her [gender] is an issue. An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints." [citing *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000) and *Dey v. Colt Constr. & Dev't Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994).]

*See Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 723, 727 (7th Cir. 2003). As in *Sitar*, the evidence supports the inference only that Trela complained to Davidson about mistreatment, not gender-based mistreatment and not sexual harassment. As the *Sitar* court noted, Trela was not obligated to say any "magic words." *See also Swinney v. Ill. State Police*, 332 Fed. Appx. 316, 318 (7th Cir. 2009). But the key inquiry is "what the record shows that [the employer] actually knew," *id.*, and there is no evidence in the record to show that UPS, through Davidson, knew that Trela was asserting that she suffered sexual harassment or gender discrimination.[8] Thus, Trela did not engage in protected activity in her August 7, 2008 meeting with Davidson.

---

[8] The court notes Trela's testimony (that she does not cite) that Davidson responded to her complaint as follows: "[Davidson] said that [Vickers] is belittling me. And he is harassing me and belittling me." Pl.'s Ex. 2, at 274:12-13. "Harassing" means only "annoy[ing], alarm[ing], or caus[ing] substantial emotional distress." *See* Black's Law Dictionary, harassment (8th ed. 2004). That term, without more, lacks any suggestion of sexual- or gender-based overtones. Davidson's statement therefore fails to evince any protected activity by Trela for the same reasons Trela's statements do. (*footnote continued.*)

## B. Adverse Employment Action

Even if Trela could establish that she engaged in protected activity, she has not established a triable issue of fact that she suffered an adverse employment action. Trela does not argue, and no evidence supports, that UPS actually fired her. Rather, Trela maintains that she suffered an adverse employment action by constructive discharge at the August 12 meeting with Greer.

The Seventh Circuit has stated, "Constructive discharge can take on two different forms." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008). Both forms require that the plaintiff be "'forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable.'" *Id.* at 408 (quoting *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002)). The first type of constructive discharge is one in which the plaintiff "resigns due to alleged discriminatory harassment." *Id.* at 409. In such a situation, she must "'demonstrate a discriminatory work environment even more egregious than the high standard for hostile work environment.'" *Id.* (quoting *Univ. of Chi. Hosps.*, 276 F.3d at 331-32 (internal citation and quotation marks omitted)).

Trela has made no showing that she suffered an egregious discriminatory work environment. Her work environment may have been unpleasant, as evidenced by her testimony that Vickers screamed and yelled at her, and that Vickers made up the numbers in her Book. However, there is no indication that Vickers's treatment of Trela was

---

UPS also argues that even if the complaint of which it, through Davidson, knew concerned sexual harassment, there is no evidence that Trela had a reasonable good faith belief that Vickers's conduct violated Title VII, as is the requirement for Trela's complaint to be considered protected activity. *See Tate v. Executive Mgmt. Servs., Inc.*, 546 F.3d 528, 532 (7th Cir. 2008). Trela does not address this argument in her response. This is a closer issue, and one that the court need not resolve it light of its holding that Trela did not complain of sexual harassment and so did not engage in protected activity.

discriminatory or sexually harassing, as discussed above.[9]  Most importantly, Trela does not argue that she resigned *due to* any harassment, but rather that she reported the alleged harassment, then "she was berated for doing so and forced out of a job."  (Resp. 8.)

A constructive discharge also occurs when "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns."  *See Fischer*, 519 F.3d at 409.  Trela's argument that she was "berated" and "forced out of a job" may fit more closely with this second type of constructive discharge.  To satisfy this requirement, the Seventh Circuit has noted that the employer's actions must have made clear that "'handwriting [was] on the wall' and the axe was about to fall."  *Univ. of Chi. Hosps.*, 276 F.3d at 332 (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998) (alteration in original)).

UPS made no such communication here.  Neither Greer nor Vickers told Trela that she was in danger of being terminated or that any further problems would be "the last straw," or even that she had been disciplined.  *See id.*  While Trela claims that she was "berated" into quitting, her competent statements of fact support only that she met with Greer and Vickers, and that, after Vickers denied fudging her pph numbers, Trela stood up, said, "You won, Tim," and walked out of the meeting.[10]

---

[9] Trela's abandonment of her sexual harassment claim is not relevant to whether she was constructively discharged.  Nevertheless, Trela must establish a genuine issue of material fact that she was constructively discharged, and the first method by which she might establish such an issue of fact is by evidence showing that she worked in a discriminatory work environment.  As explained above, she has not done so.

[10] According to one of Trela's stricken statements of fact, Greer said to Trela, "So you quit? You quit? Tell me you quit.  Does it mean you quit? You quit?" (Def.'s Resp. ¶ 8.)  In support, Trela cites a nineteen-page range of deposition testimony which, as described above, fails to conform to the court's and the circuit's requirements for citations to the record.  In the stricken statement of fact, Trela also cites to her EEOC charge, in which Trela averred that Greer asked her "are you quitting?  Does that mean you are quitting?"  (Pl.'s Ex. 2 ¶ 11.)  That allegation, even assuming its admissibility, neither supports Trela's stricken statement of fact (in fact, it recounts a substantially different version of Greer's statement) nor makes reasonably clear that Trela was going to be fired.

The only evidence in any way indicative of termination was UPS's confiscation of Trela's employee identification after she left the meeting with Greer. Even that confiscation meets two problems. First, Trela had already walked out of a meeting in which Greer says she quit. Second, even after that confiscation, Trela met with Davidson, Navarro, and Perteet, the last of whom promised to convince her to come back to work. In fact, Perteet called Trela three times. In other words, UPS indicated that it wanted her to continue her employment and acted consistent with that indication. Trela admitted receiving one such call, which she says she tried to return but encountered an automated telephone system that she could not navigate. She admits that she made no further attempt to contact Perteet or to return to her employment at UPS. UPS's actions, even after confiscating her identification, did not make reasonably clear that Trela was about to be fired.

Trela has not created an issue of fact suggesting that her termination was imminent, or that harassment forced her to resign, and therefore has failed to establish an issue of fact supporting her claim of an adverse employment action.

## C. Causal Connection

Trela has not produced evidence creating a genuine issue of material fact that she engaged in protected activity or that she suffered an adverse employment action. The court therefore does not consider whether evidence of a causal connection exists between these two alleged events.

## IV. CONCLUSION

For the reasons stated above, UPS's motion for summary judgment is granted.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: February 10, 2010